# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

---

№ 21-CV-1061 (RER)

---

LOUIS A. GALLONTY, III,
AS THE PRELIMINARY EXECUTORY OF THE ESTATE OF,
FRANCESCA CONFORTI,

PLAINTIFF,

VERSUS

COMMISSIONER OF SOCIAL SECURITY,

DEFENDANT.

---

**MEMORANDUM & ORDER**

September 5, 2024

---

**RAMÓN E. REYES, JR., United States District Judge:**

Louis A. Gallonty, III, as Preliminary Executor of the Estate of Francesca Conforti ("Plaintiff") brings this action against Andrew M. Saul, the Commissioner of the Social Security Administration ("Defendant" or "Commissioner"), pursuant to the Social Security Act 42 U.S.C. § 405(g) ("The Act") and seeks review of Defendant's denial of Francesca Conforti's application for disability insurance benefits ("DIB"). (ECF No. 1 ("Compl.")). Before the Court are the parties' cross-motions for judgment on the pleadings. (ECF No. 21 ("Pl. Mot."); ECF No. 23, Ex. 1 ("Def. Mot.")). After careful review, and for the reasons set forth herein, the Court grants Plaintiff's motion and denies Defendant's motion. This

matter is remanded to the Commissioner for further proceedings consistent with this memorandum and order.

## BACKGROUND

I.     Plaintiff's Applications for Disability Insurance Benefits

Plaintiff was 51 years old when she was last insured for DIB. (ECF No. 10, Exs. 1, 2 (Parts 1, 2, and 3 of the "Administrative Transcript" or "Tr.") at 86, 157). Plaintiff graduated from high school and from 2000 to 2012 worked as a document scanner for a credit union. (Tr. at 42–46, 160–61). Plaintiff claimed to suffer from the following severe impairments: "fibromyalgia, osteopenia of the left hip and lumbar spine, plantar fasciitis, left metatarsal stress injury, hiatal hernia, rotator cuff tear/tendonitis, degenerative disc disease, tendinosis, arthritis, chronic obstructive pulmonary disease ["COPD"], obesity, sleep apnea, hearing loss, sinus tachycardia, diabetes mellitus, major depressive disorder[,] and generalized anxiety disorder." (ECF No. 21 at 6).

On October 23, 2012, Ms. Conforti filed for DIB with the claimed onset date of June 12, 2012. (Tr. at 76, 1891). On March 18, 2014, she received an unfavorable decision from Administrative Law Judge Dennis Katz, of which the Appeals Council denied review on May 14, 2015. (Tr. at 1891).

On August 24, 2015, Plaintiff filed for benefits a second time, alleging an onset date of June 12, 2012. (Tr. at 10, 86, 157). As a result of a prior decision not discussed herein, the alleged onset date was administratively amended to March 19, 2014. (Tr. at 1891). Plaintiff's date last insured was December 31, 2017. (Tr. at 86, 1891).

On December 31, 2015, the Commissioner denied Plaintiff's applications for benefits. (Tr. at 89). On January 6, 2016, Plaintiff filed a request for an administrative hearing. (Tr. at 100).

A.    First Hearing and Subsequent Procedure

Plaintiff did not receive a hearing until November 29, 2017—almost two years after her request, and two years and three months after the DIB application at issue—before Administrative Law Judge Laura Michalec Olszewski (the "ALJ"). (Tr. at 35, 89, 100). The ALJ, Plaintiff, Plaintiff's counsel (Anselmo Alegria), and a reporter were present at the hearing. (Tr. at 37–38). A vocational expert, Linda Stein ("Ms. Stein"), was present by phone. (Tr. at 38). After some preliminary questions verifying Plaintiff's basic information, the ALJ examined Plaintiff, asking a series of questions to prompt Plaintiff's testimony. (Tr. at 38–42).

Plaintiff testified that her mother previously helped her, but she had passed away recently, and Plaintiff's siblings currently helped her by driving. (Tr. at 43–44). Plaintiff did not drive and only took public transportation if she had to, otherwise she would order deliveries of items she needed. (Tr. at 43–44). Plaintiff also testified about her twelve years working as a document scanner for the U.S. Alliance Federal Credit Union until she was laid off. (Tr. at 44–46). In a typical day, Plaintiff explained, she would wake up, wash her face, make coffee, and play games on her computer or watch television. (Tr. at 46–47, 49). If she had appointments, the next day she would have so little energy that she would "feel dead." (Tr. at 46). Plaintiff testified it was "hard to explain" that she typically did not eat, and that she would "get disgusted" and lose her appetite, unless she was happy. (Tr. at 47). When she ate, Plaintiff had microwave meals consisting of beans, rice,

3

vegetables, or chicken, and sometimes picked up a pizza nearby. (Tr. at 48, 51). When the ALJ asked about household chores, Plaintiff claimed she could not vacuum due to back pain, but sometimes washed dishes and did very little laundry by throwing laundry down the stairs. (Tr. at 47). The ALJ asked why Plaintiff was unable to work, and Plaintiff claimed she had trouble standing or sitting for long periods of time and had the reading level of "grade six." (Tr. at 51–52).

Plaintiff's counsel then asked follow-up questions. (Tr. at 53). In response, Plaintiff testified she did laundry weekly or biweekly and could only carry fifteen pounds at a time. (Tr. at 53–54). Plaintiff needed to lift forty or fifty pounds at her prior job as a document scanner. (Tr. at 53). Plaintiff had difficulty hearing and focusing, to the point where it was hard to follow television shows. (Tr. at 54). Plaintiff described feeling fatigue and difficulty breathing, which she understood to be a result of her COPD. (Tr. at 54–55). Plaintiff had trouble sleeping. (Tr. at 55). Plaintiff also described feeling "weak and really tired" when she did activities, such as laundry. (Tr. at 56, 59). Plaintiff had muscle spasms in her leg, pain in her neck, feet and back, and bulges in her spine. (Tr. at 57–59). At the time of the hearing, Plaintiff weighed 181 pounds and was four feet, ten inches tall. (Tr. at 60). Plaintiff had previously exercised but stopped because her insurance no longer paid for the rehabilitation she attended and the pain in her feet worsened. (Tr. at 61–62). Plaintiff had a torn rotator cuff in the shoulder on her non-dominant side. (Tr. at 62–63).

After confirming some preliminary information, the vocational expert, Ms. Stein, was examined by the ALJ. (Tr. at 65). Ms. Stein characterized Plaintiff's past work as a document specialist or photocopy machine operator, with the Dictionary of Occupational Titles ("DOT") number 207.685–014, an SVP of 2, and light exertion. (Tr. at 65). The ALJ

posed the question of what a hypothetical individual with Plaintiff's limitations would be able to do for work. (Tr. at 65–67). In the process of posing the hypothetical to Ms. Stein, the ALJ asked Plaintiff if she was "treating for any kind of mental illness," to which Plaintiff responded that she took 60 milligrams of Paroxetine per day and saw a psychiatrist and social worker. (Tr. at 66). Ms. Stein testified that the "document specialist could still be performed" by such an individual. (Tr. at 67). Ms. Stein also opined that three other "unskilled positions at the light exertional level . . . would fit the hypothetical" as follows: (1) a "bander, comma, hand," with DOT 920.687–026, SVP of 1, and national numbers of 705,660; (2) an "inspector and hand packager," with DOT 559.687–074, SVP of 2, and national numbers of 518,950; and (3) a "ticket taker" with DOT 344.667–010, SVP of 2, and national numbers of 117,900. (Tr. at 67). Ms. Stein also testified that these positions "do not involve overhead reaching" and allow for up to "15 percent [of time] off task," and "[n]o more than one day per month" of absenteeism. (Tr. at 68). These positions also would allow for the employee to sit or stand intermittently. (Tr. at 68). Further, were the individual to be off task 20 percent of the time or more, that "would rule out all full-time gainful employment." (Tr. at 68).

Plaintiff's counsel then followed up with questions for the vocational expert. (Tr. at 69). Ms. Stein opined that the previous work of a document specialist could be performed with light exertion, as it typically is "performed in the national economy," despite Plaintiff's testimony of her prior work requiring medium exertion. (Tr. at 69). Ms. Stein confirmed that Plaintiff could no longer perform her past work as previously performed but could do it as generally performed. (Tr. at 70). Plaintiff's counsel and the ALJ confirmed that the record was complete, and the hearing concluded. (Tr. at 72).

B.     The ALJ's 2018 Decision

On February 21, 2018, the ALJ found the Claimant was not entitled to benefits (the "2018 Decision"). (Tr. at 10–34). The 2018 Decision begins by briefly describing the procedural history leading up to a hearing and the applicable statutes, including the "five-step sequential evaluation process for determining whether an individual is disabled." (Tr. at 10–12 (citing 20 CFR 404.1520(a)). Next, the 2018 Decision applied the five-step evaluation process.

At steps one and two,[1] the ALJ made three findings: (1) the last date of Plaintiff's insured status was December 31, 2017; (2) the Plaintiff "did not engage in substantial gainful activity" from the "onset date of June 12, 2012 through her date last insured;" and (3) Plaintiff had the severe impairments of left metatarsal stress injury, obesity, osteopenia of the left hip and lumbar spine, sleep apnea, hiatal hernia, tendinosis, rotator cuff tear/tendonitis, arthritis, chronic obstructive pulmonary disease ("COPD"), hearing loss, degenerative disc disease, sinus tachycardia, depressive disorder, and anxiety disorder. (Tr. at 12–13). The 2018 Decision acknowledged these impairments "cause significant . . . limitations on [Plaintiff's] ability to do basic work activities" and have lasted at a severe level for more than 12 continuous months. (Tr. at 13).

Also at step two, the ALJ found that Plaintiff's diagnoses of "gastroesophageal reflux disease ('GERD'), hypothyroidism, diabetes mellitus . . . hyperlipidemia, left parieto

---

[1] As explained further herein, the ALJ "must determine," at step one, "whether the [Plaintiff] is engaging in substantial gainful activity," and at step two, "whether the [Plaintiff] has a medically determinable impairment that is 'severe' or a combination of impairments that is 'severe.'" (Tr. at 11 (first citing 20 CFR 404.1520(b); and then citing 20 CFR 404.1520(c)); *see also infra*.

occipital cavernoma . . . plantar fasciitis and substance abuse disorder," are "non-severe" because they "do not impose more than minimal work related limitations, are adequately controlled with medication[,] or have not met the durational requirement of a severe impairment." (Tr. at 13). The ALJ also found "no evidence that [fibromyalgia] was diagnosed in accordance with" accepted criteria, which requires: (1) history of widespread pain; (2) either: (a) at least 11 positive, bilateral tender points above and below the waist; or (b) repeated manifestations of six or more fibromyalgia symptoms, "especially manifestations of fatigue," depression, or anxiety; and (3) evidence that other disorders that could cause these symptoms were excluded. (Tr. at 14). The 2018 Decision claims that Plaintiff's "alleged fibromyalgia is not a medically determinable impairment" because Plaintiff did not receive a tender point examination, there was "no evidence that she suffers from six or more fibromyalgia symptoms, signs, or co-occurring conditions," and other disorders were not ruled out as potential causes of Plaintiff's symptoms. (Tr. at 14).

At step three,[2] the 2018 Decision concluded Plaintiff "did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526)." (Tr. at 14). As justification for this finding, the ALJ claimed lack of "medical evidence" in the record to meet "the criteria of any listed impairment," and the "signs, symptoms, and/or laboratory findings" do not indicate a severity required for relief.

---

[2] At step three, the ALJ "must determine whether the claimant's impairment or combination of impairments is of a severity to meet or medically equal the criteria of an impairment" listed in the statute. (Tr. at 11 (citing 20 CFR Part 404, Subpart P, Appendix 1; 20 CFR §§ 404.1509, 404.1520(d), 404.1525, and 404.1526)).

(Tr. at 14). The ALJ also found "[n]o treating, examining, or non-examining medical source" gave an opinion to the contrary. (Tr. at 14–15).

The ALJ gave "special consideration to listings 1.02, 1.04, 2.10, 3.02, 3.10, 4.04, 12.04 and 12.06." (Tr. at 15). For listing 1.02, which governs shoulder, hip, and foot impairments, the ALJ noted "there is no evidence of gross anatomical deformity of the hip, knees, shoulders, elbows or wrists and no medically acceptable imaging showing joint space narrowing, bony destruction or ankylosis of the affected joints resulting in inability to ambulate effectively or inability to ambulate or to perform fine and gross movements effectively." (Tr. at 15). For listing 1.04, which governs spinal impairments, the ALJ acknowledged Plaintiff's degenerative disc disease, but claimed it was not sufficiently severe because "the medical evidence fails to reveal (a) neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss accompanied by sensory or reflex loss; (b) spinal arachnoiditis, requiring the need to change positions/posture more than once every two hours; nor (c) an inability to ambulate effectively." (Tr. at 15). Listing 2.10 covers hearing loss, which the ALJ found was effectively treated. (Tr. at 15). With regard to listing 3.02, outlining the criteria for COPD, the ALJ found "no evidence of impairment of gas exchange with accompanying findings nor exacerbations/ complications requiring hospitalizations," and that Plaintiff's "pulmonary function tests revealed FVC and FEVI values all surpassing these threshold amounts." (Tr. at 16). As

for listing 4.04, the ALJ stated only "although the claimant has been diagnosed with sinus tachycardia, there is no evidence of myocardial ischemia[3] in the record." (Tr. at 15).

The ALJ applied listings 12.04 and 12.06 together, as they both govern mental impairments. (Tr. at 16). The ALJ found Plaintiff's mental impairments to be moderate, rather than severe, because although she has difficulty focusing or concentrating, she is "able to get along with others, shop, spend time with friends and family, and take public transportation," and "could perform simple maintenance, prepare meals, pay bills, go to doctor's appointments, take medications, take public transportation, shop, read, and play games." (Tr. at 16). Additionally, though Plaintiff had "mild limitations in her ability to adapt or manage herself," the ALJ found Plaintiff was "able to handle self-care and personal hygiene, care for pets, and get along with caregivers." (Tr. at 16). In sum, the ALJ found that the paragraph B criteria were not satisfied because these mental impairments did not cause any marked or extreme limitations. (Tr. at 17). Looking at the paragraph C criteria, which help rate the severity of mental impairments at steps 2 and 3, the ALJ found that Plaintiff's mental impairments have "persisted for more than two years," but "the evidence fails to show that the claimant has achieved only marginal adjustment[s]" because of "outpatient therapy and outpatient medication management." (Tr. at 17). The ALJ justifies this finding by noting "claimant is able to independently manage her medical care, help care for others and respond to situational stressors without exacerbations of her mental impairments." (Tr. at 17). Finally, although the ALJ noted "special consideration" of listing

---

[3] "Myocardial ischemia occurs when blood flow to your heart is reduced, preventing the heart muscle from receiving enough oxygen." https://www.mayoclinic.org/diseases-conditions/myocardial-ischemia/symptoms-causes/syc-20375417.

3.10, the 2018 Decision lacks any explanation of how the ALJ believed it applied at steps two or three. (Tr. at 14–16).

At step four,[4] the ALJ determined Plaintiff had the following maximum Residual Functional Capacity ("RFC"):

> [C]apacity to perform light work as defined in 20 CFR 404.1567(b) except she was able to occasionally climb ramps and stairs but never climb ladders and scaffolds. They are able to occasionally balance and stoop, but could never kneel, crouch and crawl. They need to avoid reaching overhead with the left non-dominant upper extremity but can frequently reach, push and pull in all other directions up to the limits of light work. The individual is able to have occasional exposure to respiratory irritants such as dust, odors, fumes and gases and extreme hot and cold temperatures. The individual is limited to a low stress environment defined as occasional use of judgment, occasional decision-making, and occasional changes in work setting. She can perform simple and routine tasks and is able to work in a moderate noise level environment.

(Tr. at 17). The 2018 Decision goes on to explain that Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms," including tiredness, pain, difficulty focusing or breathing, but "the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence." (Tr. at 18–19). The ALJ cited to the following activities as inconsistencies: Plaintiff cared for herself and her pet cat,[5] Plaintiff "played games on her computer, prepared simple meals, did small loads of laundry, used public transportation, shopped in stores, handled finances, watched

---

[4] Step four requires assessment of whether the Plaintiff "has the [RFC] to perform the requirements of her past relevant work." (Tr. at 12 (citing 20 CFR §§ 404.1520(f), 404.1560(J), and 404.1565)).

[5] There is no citation for the ALJ's assumption that Plaintiff has a cat or otherwise cares for pets. Plaintiff did not mention any pets in the 2017 Hearing, but rather that she played a game called *Pet Rescue*. (Tr. at 48).

10

television, socialized with others (on the phone and computer), and had no trouble getting along with others[.]" (Tr. at 19). Plaintiff also purportedly "cooked four days a week, cleaned twice a week, shopped four days a week, showered/bathed on a daily basis, watched television, read and attended doctor appointments." (Tr. at 19).

When assessing the impact Plaintiff's alleged mental impairments may have on the RFC, the 2018 Decision relied primarily on these activities to discount Plaintiff's documented history of "anxiety attacks since 2012," "sleep/mood disturbance," "substance dependence, social withdrawal/isolation, decreased energy, generalized persistent anxiety and pathological dependence/passivity, with diagnoses of major depressive disorder, [and] generalized anxiety disorder.]" (Tr. at 23). The ALJ noted that Plaintiff's "sinus tachycardia" was "triggered by anxiety," but that was improved with Xanax. (Tr. at 22). Additionally, "Klonopin appeared initially effective in controlling her symptoms." (Tr. at 23). The ALJ noted endorsements of "arguments with family members, a lack of close relationships, poor appetite, poor self-care and poor sleep," but ultimately rested on the fact that Plaintiff "consistently demonstrated adequately adaptive functioning and interpersonal skills" in medical examinations and at the hearing. (Tr. at 23).

Also at step four, the 2018 Decision discounted several of Plaintiff's physical symptoms as inconsistent. (Tr. at 19–24). For example, Plaintiff complained of left foot pain, and certain tests showed "no evidence of any neuropathy[,] nerve impingement[, or] fractures," but also had an MRI "revealing a strain of the soleus muscle, midfoot arthritis, small ankle effusion and small soft tissue lipoma." (Tr. at 19). The bone density testing also revealed inconsistent results, according to the ALJ, with a decrease in density in the

left him and lumbar spine in 2013, but "only osteopenia of her radius and ulna" in 2015. (Tr. at 19). The 2018 Decision also claims there is "no evidence of persistent daytime somnolence or fatigue," despite Plaintiff's diagnosis of sleep apnea, a left-sided Bochdalek hernia, and complaints of tiredness. (Tr. at 19). As relevant to Plaintiff's "left shoulder symptoms," the ALJ found that a "physical therapy evaluation indicated . . . left shoulder adhesive capsulitis and left acromioclavicular joint osteoarthritis," and a "MRI revealed mild supraspinatus tendinosis with superimposed low-grade partial-thickness tearing of distal tendon but with a normal acromioclavicular joint." (Tr. at 20). The ALJ noted, however, that "Aleve provided temporary pain relief" and Plaintiff had "left shoulder rotator cuff repair, joint resection and acromioplasty." (Tr. at 20). The ALJ also found Plaintiff's complaints of back and neck pain to be accommodated by "light exertional level" work, because "generally unremarkable" examinations revealed normal gait, strength, reflexes, and sensation. (Tr. at 21–22).

Respiratory complaints were also discounted as inconsistent. (Tr. at 20). Though "the record reveals a history of dyspnea, shortness of breath and chest pain," "COPD was also noted in contemporaneous treatment notes," "moderate obstructive airways disease" and "moderate restriction" were found in testing in 2012 and 2013, the ALJ found Plaintiff's COPD-related complaints non-severe because a nuclear stress test, echocardiogram, and an x-ray were "normal" during that time frame. (Tr. at 20). As for the record in 2014, the ALJ noted a "pulmonary function test showed severe obstruction and restrictive ventilatory impairment with severe reduction in diffusing capacity," but other tests showed only moderate restriction or "no evidence of interstitial lung disease." (Tr. at 20). The ALJ noted that Plaintiff's shortness of breath appeared to improve from 2014 to 2017, by

Plaintiff's reports at appointments and tests revealing "moderate combined obstructive and restrictive ventilatory impairment with moderate reduction in diffusion," and "clear lungs." (Tr. at 20).

The ALJ also assigned certain weights to the treating providers, as described in more detail further below. (*See infra* Part II; *see also* Tr. at 23–24). In sum: (1) the ALJ afforded great weight to the opinion of Dr. Kaci; (2) partial weight to Dr. Kandalaft's, Dr. Rozelman's, and social worker Larry Torrisi's opinions; (3) less weight to Dr. Kase's opinion; and (4) little weight to that of Dr. Gutwein. (Tr. at 21, 23–24).

The ALJ found that in light of the "medical evidence, the claimant's residual daily activities, the opinion evidence . . . and [Plaintiff's] numerous unremarkable physical and mental status examinations," Plaintiff was "limited to a range of work at the light exertional level" with some limitations. (Tr. at 25). As such, concluding step four, the ALJ found Plaintiff could perform "past relevant work as a document specialist," which "did not require the performance of work-related activities precluded by [Plaintiff's] [RFC]." (Tr. at 25). The ALJ noted the work was "actually performed at the medium exertional level," and though Plaintiff was limited to the "light exertional level" at which the job is "generally performed," the ALJ found this to be consistent with the Vocational Expert's testimony. (Tr. at 25).

Finally, at step five,[6] the ALJ found "there are other jobs existing in the national economy that she is also able to perform." (Tr. at 25–26). Considering Plaintiff's attributes

---

[6] At step five, an ALJ determines "whether the claimant is able to do any other work considering her [RFC], age, education, and work experience," and if so, provide "evidence that demonstrates that other work exists in the national economy that the claimant can do." (Tr. at 12 (citing 20 CFR §§ 404.1520(g), 404.1512(f), 404.1560(c))).

in conjunction with the Medical-Vocational Guidelines, the ALJ explained Plaintiff's "ability to perform all or substantially all of the requirements of [performing a light] level of work was impeded by additional limitations." (Tr. at 26). Because of this, the ALJ relied on the Vocational Expert's testimony that, given Plaintiff's "age, education, work experience, and [RFC]," Plaintiff would be able to "perform the requirements of representative occupations such as hand bander," "inspector/hand packager," and "ticket taker." (Tr. at 26). Thus, the ALJ came to a finding of "not disabled." (Tr. at 26).

### C.    Subsequent Appeal and Remand

On March 29, 2018, Plaintiff requested review of the 2018 Decision by the Appeals Council. (Tr. at 155). On January 30, 2019, the Appeals Council declined review, which made the ALJ's February 21 denial the "final decision" subject to review pursuant to 42 U.S.C. § 405(g). (Tr. at 2–4). On April 3, 2019, Plaintiff filed a civil action in the Southern District of New York because she lived in Westchester County at the time. (Tr. at 2088). In January of 2020, the Appeals Council and Plaintiff stipulated to remand the application to the Appeals Council for consideration of new evidence. (Tr. at 2091–93). On May 7, 2020, the Appeals Council remanded the matter further to the ALJ with specific instructions to address three main issues. (Tr. at 2096–98).

First, the Appeals Council determined the ALJ's "finding that the claimant's fibromyalgia is not a medically determinable impairment under Social Security Ruling 12-2p is not supported by substantial evidence." (Tr. at 2096). The Appeals Counsel characterized the ALJ's findings of no documented tender points, no examination, no ruling out of other symptoms, and no widespread pain, as "inaccurate." (Tr. at 2096–97). The Appeals Counsel noted the repeated documentation of tests and diagnoses by two

of Plaintiff's doctors. (Tr. at 2096–97). On remand, the ALJ was instructed to further consider the "severity and effects of the claimant's fibromyalgia," "the treating and nontreating source opinions," and "explain the weight given to such opinion evidence." (Tr. at 2097–98).

Second, the ALJ made factual findings pertaining to a time prior to the administratively tolled onset date. (Tr. at 2097). Plaintiff previously had filed a claim on October 23, 2012, and received an unfavorable decision, but the 2018 Decision made findings from June of 2012. (Tr. at 2097). Thus, the ALJ was instructed to "[e]nsure that the decision adjudicates the correct period at issue." (Tr. at 2097).

Third, the 2018 Decision did "not address an inconsistency between the vocational expert's testimony and the . . . DOT." (Tr. at 2097). While the "[RFC] precludes overhead reaching with the left" arm, the DOT jobs identified in step 5 of the opinion all "require frequent reaching," and though the expert claimed at the hearing that the jobs do not involve overhead reaching, that was not addressed or explained further. (Tr. at 2097). As such, the ALJ was instructed to (1) "give further consideration to the claimant's maximum [RFC] in light of the reconsidered evidence," (2) "provide appropriate rationale with specific references to evidence of record," and (3) "identify and resolve any conflicts between the occupational evidence provided by the vocational expert and information in the [DOT.]" (Tr. at 2098).

D.    Second Hearing and Subsequent Procedure

On October 27, 2020, Plaintiff appeared for a second hearing with the same ALJ, this time by telephone. (Tr. at 2074–85). The ALJ, Plaintiff, Plaintiff's attorney, and a vocational expert named Michele Wells were present. (Tr. at 2077–79). After some

15

preliminary questions verifying Plaintiff's basic information, the hearing occurred. (Tr. at 2076–81).

The ALJ briefly noted the procedural posture of the matter following remand. (Tr. at 2081). The ALJ expressed disbelief that further testimony was necessary, without justification or reference to the reason for remand, and noted additional treatment documents were received since the last hearing. (Tr. at 2081–82). Plaintiff's counsel confirmed which new materials were relevant, and they were admitted into evidence, then counsel and the ALJ agreed further testimony from the Plaintiff was unnecessary. (Tr. at 2083–84). The ALJ dismissed the vocational expert from the hearing without asking her any questions. (Tr. at 2084). The ALJ confirmed she would review the evidence and write a new decision addressing the Appeals Council's concerns and concluded the hearing. (Tr. at 2084–85).

E.      The ALJ's 2020 Decision and Appeal

On November 4, 2020, the ALJ again denied Plaintiff's claim for benefits, which became the Commissioner's final decision (the "2020 Decision"). (Tr. at 1888–1918). The 2020 Decision contained few, if any, substantive changes from the 2018 Decision (together, the "Decisions"). (*Compare* Tr. at 10–27 *with* Tr. at 1891–1910). The 2020 Decision successfully addressed the Appeals Council's second concern about the appropriate period. Specifically, the ALJ made clear that *res judicata* applied "for the period of June 12, 2012 to March 18, 2014" due to Plaintiff's prior, unsuccessful claim for benefits and clarified the dates of disability at issue. (Tr. at 1894, 1909–10). The ALJ added caveats indicating that prior medical records were considered for "historical

16

purposes only," leaving much of the discussion of prior records otherwise unchanged. (*See, e.g.*, Tr. at 1902, 1905).

Most of the changes in the 2020 Decision have no relation at all to the first and third issues raised by the Appeals Council: consideration of Plaintiff's fibromyalgia diagnosis and the resolving conflicting information from the Vocational Expert and Plaintiff's RFC. (Tr. 2096–98). A paragraph discussing the effect of Plaintiff's "obesity" was added, though obesity is "no longer a listed impairment." (Tr. at 1897). The 2020 Decision also included examples of activities that fit within certain areas of mental functioning that are evaluated as part of the "paragraph B" criteria, but these examples were made generally rather than in relation to Plaintiff's testimony or the record. (Tr. at 1897–99). The 2020 Decision corrected the dates for the consultative examinations by Dr. Kase and Dr. Kaci, respectively. (Tr. 1903–04). The ALJ added a few sentences regarding Plaintiff's recent records for a nosebleed and additional pulmonary function test. (Tr. 1905).

On the first issue, the 2020 Decision added a few paragraphs that acknowledged the documentation of severe impairments, including the mention of fibromyalgia, but concluded, "the medical record does not corroborate the level of incapacity alleged by the claimant." (Tr. at 1901). As justification for this, the ALJ reiterated Plaintiff's "daily activities" that were already repeated throughout the decision without assessing any new evidence on this point. (Tr. at 1901–02, 1907). The following text was added to the assessment of Dr. Gutwein's opinion: "While Dr. Gutwein noted 18/18 fibromyalgia tender points (as the Appeals Council even pointed out) and even accepting fibromyalgia in addition to all Dr. Gutwein's listed diagnoses, . . . [s]uch negative examination findings

and abilities by the claimant (*e.g. daily activities*) are contrary to Dr. Gutwein's opinion that the claimant is so limited." (Tr. at 1906 (emphasis added)). Beyond that, and a few words acknowledging that Dr. Kaci's examination also "indicated a total of 12 trigger points," there was no more consideration of the effects of Plaintiff's fibromyalgia diagnosis in the 2020 Decision from the 2018 Decision. (Tr. at 1903–04).

As for any apparent attempt to address the conflicting RFC and vocational testimony, the ALJ seems to have added a few paragraphs reiterating, yet again, the activities the ALJ harped on. (Tr. at 1907–08). Otherwise, much of the text discussing the RFC includes the same exact words in different formatting. (Tr. at 1909). The ALJ also added a new sentence that relied on testimony from the 2017 Hearing: "When asked whether the DOT distinguishes between upper extremity and overheard reaching bilaterally for the jobs cited, the vocational expert testified that the three jobs cited do not involve overhead reaching." (Tr. at 1909). Aside from the changes listed above, the Decisions are virtually indistinguishable.

Plaintiff filed the Complaint in this action on February 26, 2021, in the Eastern District because Plaintiff resided in Brooklyn, New York, at the time. (Compl. ¶¶ 1–3). Plaintiff seeks review of the Commissioner's denial of benefits. (*Id.*) On March 1, 2022, the Court granted Plaintiff's motion for Louis A. Gallonty, III (the "Executor"), to substitute Plaintiff in her claims following Plaintiff's death. (ECF Nos. 12–18). On April 22, 2022, Plaintiff moved for judgment on the pleadings pursuant to Fed. R. Civ. Pro. 12(c). (ECF Nos. 20, 21). Defendant opposed and crossed-moved for judgment on the pleadings in their favor. (ECF No. 23, Ex. 1). On January 12, 2024, this matter was reassigned to the undersigned.

18

II.     Relevant Medical Evidence

      A.     Dr. Charles Kandalaft

Dr. Charles Kandalaft, a member of the Westchester Psychiatric Association, was Plaintiff's treating psychiatrist from about August 13, 2013, to January 24, 2017. (Tr. at 490, 2653–2704). He treated Plaintiff about 33 times and diagnosed her with major depressive disorder and generalized anxiety disorder. (Tr. at 485, 2673). This diagnosis is reflected in the medical source statement Dr. Kandalaft provided dated July 23, 2015. (Tr. at 485–90, 2673–84). Dr. Kandalaft prescribed Plaintiff Prozac. (Tr. at 486). Plaintiff's records also indicate being prescribed Lorazepam, also known as Xanax. (Exs. B9F, B40F).

Dr. Kandalaft opined that Plaintiff would likely be absent from a job more than three times a month due to the combined impact her "emotional problems" would have with her "pain & physical symptoms." (Tr. at 487). Additionally, he opined Plaintiff could not sustain a routine without supervision, work in close coordination with others, work at a consistent pace absent long breaks, manage changes in routine, or handle a normal level of stress. (Tr. 488–489). Even the ALJ noted Dr. Kandalaft's finding that Plaintiff had "deficiencies of concentration[,] persistence[,] pace and repeated episodes of deterioration [and] decompensation." (Tr. at 23). As noted above, the ALJ instead found Plaintiff's general composure and references to daily activities at the hearing more compelling than this medical evidence, and as a result, assigned only partial weight to Dr. Kandalaft's opinion. (*See* Tr. at 23).

B.     Dr. Farrah Gutwein

Starting on October 8, 2014, Dr. Farrah Gutwein, a rheumatologist, treated Plaintiff for "diffused body pain." (Tr. at 1544). After examination, Dr. Gutwein noted "Joint Tenderness" as "all joints tender." (Tr. at 1544). Dr. Gutwein listed 18 bilateral tender points and diagnosed Plaintiff with fibromyalgia. (Tr. at 1545). Dr. Gutwein examined Plaintiff again on October 28, 2014, and noted "Joint Tenderness Bilateral, DIP 2, DIP 3, DIP 4." (Tr. 1541). In a subsequent examination, Dr. Gutwein again noted, "Joint Tenderness Bilateral, DIP 2, DIP 3, DIP 4." (Tr. at 1538). Dr. Gutwein consistently reported positive tender points after additional examinations on May 7, 2015, August 27, 2015, and January 21, 2016. (Tr. at 1532, 1529, 1526). After another examination on January 26, 2017, Dr. Gutwein reported that Plaintiff suffered from "diffused pain and fatigue that lasts all day." (Tr. at 1515). Based on a Magnetic Resonance Imaging (an "MRI") report of Plaintiff's lumbar spine, Dr. Gutwein described Plaintiff as having "moderate facet osteoarthritis L4-L5." (Tr. at 1562).

Dr. Gutwein provided a medical source statement dated January 26, 2017, that indicated Plaintiff had "diffuse muscle and joint tenderness, 18/18 fibromyalgia tender points." (Tr. at 934–40). Further, Plaintiff experienced "stiffness with prolonged inactivity, unable to sit or stand for prolong[ed] periods, poor sleep, daytime fatigue, [and] difficulty concentrating." (Tr. at 934–35). Dr. Gutwein opined Plaintiff can only lift 10 lbs. and can only carry up to 10lbs. on her right side. (Tr. at 936). In a full eight-hour workday, Plaintiff could only sit for two hours, stand for two hours, and would need hourly breaks for up to 20 minutes. (Tr. at 24, 936–39). Dr. Gutwein acknowledged Plaintiff's mental impairments also caused "panic attacks and even low stress situations cause anxiety." (Tr. at 939).

The ALJ assigned "little weight" to Dr. Gutwein's records, claiming them to be based on Plaintiff's "subjective complaints" rather than independent analysis. (Tr. at 24). The ALJ failed to analyze the examinations or tests Dr. Gutwein performed. (Tr. at 24). The ALJ found the limitations noted in Dr. Gutwein's opinion as inconsistent with the "admitted activities of daily living," such as "use of a treadmill." (Tr. at 24).

C.    Dr. Steven V. Kase

Plaintiff saw Dr. Steven V. Kase for an auditory consultation to examine her hearing at the request of the Commissioner on December 17, 2015. (Tr. 587–89). Dr. Kase opined that Plaintiff had "normal hearing in the low frequency with descending from mild to severe sensorineural hearing loss and then in high frequencies," which made Plaintiff "mild to moderately disabled by her level of hearing." (Tr. at 588). Dr. Kase explained there "may be an increased level of disability" when considering "the effects of her dizziness[,] which is likely to increase." (Tr. at 588, 21). The ALJ assigned "less weight to this opinion" in the 2018 Decision, "finding that . . . hearing loss . . . responded well to use of hearing aids," and Plaintiff had no difficulty listening at the 2018 hearing." (Tr. at 21).

D.    Dr. Julia Kaci

Dr. Kaci conducted a consultative examination of Plaintiff at the behest of the Commissioner in December 2015. (Tr. at 22; Ex. B13F). The ALJ found the examination to reveal "no acute distress," normal gait, movement, strength, and full range of motion, despite that Dr. Kaci determined that Plaintiff had difficulty walking on her heels, could not perform a full squat, and had decreased lumbar spine range of motion. (Tr. at 22).

The ALJ also assigned "great weight to this opinion," because it was consistent with the examination Dr. Kaci performed and the record. (Tr. at 23–24).

E.    Dr. H. Rozelman and Dr. Melissa Antiaris

Plaintiff's medical record was evaluated by a state agency medical consultant, Dr. H. Rozelman, who did not meet with Plaintiff. (TR. at 1907). Because of this, the ALJ assigned partial weight to Dr. Rozelman's opinion that Plaintiff had mild limitations in interpersonal and social functioning. (Tr. at 1907). Plaintiff also saw Dr. Melissa Antiaris for a psychiatric evaluation consultative examination on behalf of the Commissioner. (Tr. at 2068–72). Dr. Antiaris confirmed Plaintiff's diagnoses of depressive disorder and anxiety disorder. (Tr. at 2071). Dr. Antiaris further opined that Plaintiff had mild and moderate mental impairments. (*Id.*) The ALJ ultimately found that, based on other evidence in the record, Plaintiff's mental impairments were medically severe. (Tr. at 1897–98, 1907).

F.    Other Medical Providers

The expansive medical record contains documentation of treatment from several providers who did not provide direct opinions about Plaintiff's disability status but are nonetheless relevant. Dr. John Ades was Plaintiff's primary care physician for many years, and the medical records from his office corroborate Plaintiff's history of shortness of breath, chest pain, osteopenia, back pain, and left foot pain since at least 2012. (*See* Exs. B2F, B3F, B5F, B6F, B9F; *see also* Tr. at 1902). Plaintiff also saw Dr. Charles J. Abate with Mount Kisco Medical Group as a specialist in pulmonology and sleep medicine for several years. (*See* Exs. B10F, B11F, B38F). Pulmonary Function tests conducted by Dr. Abate showed that Plaintiff had "severe obstructive and restrictive ventilator

impairment with severe reduction in diffuse capacity," had "reduced lung volumes resulting in reduced lung surface area for gas exchange," and that post-bronchodilator treatment failed to improve these issues. (Tr. 550, 563).

## STANDARD OF REVIEW

A motion for judgment on the pleadings should be granted "if, from the pleadings, the moving party is entitled to judgment as a matter of law." *Burns Int'l Sec. Servs., Inc. v. Int'l Union*, 47 F.3d 14, 16 (2d Cir. 1995) (per curium) (citing Fed. R. Civ. P. 12(c)). The standard for assessing a Rule 12(c) motion "is the same as the standard used in evaluating a motion to dismiss under Rule 12(b)(6)." *Rojas v. Berryhill*, 368 F. Supp. 3d 668, 669 (S.D.N.Y. 2019) (first citing *L–7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 429 (2d Cir. 2011); and then citing *Bank of New York v. First Millennium, Inc.*, 607 F.3d 905, 922 (2d Cir. 2010)).

In reviewing a denial of social security benefits, a district court may "enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing a decision of the Commissioner of Social Security, with or without remanding the case for rehearing." 42 U.S.C. § 405(g). The "findings of the Commissioner of Social Security as to any fact, *if supported by substantial evidence*, shall be conclusive." *Schillo v. Kijakazi*, 31 F.4th 64, 74 (2d Cir. 2022) (quoting 42 U.S.C. § 405(g)) (emphasis added). "[A] district court must determine whether the correct legal standards were applied and whether substantial evidence supports the decision." *Agolli v. Comm'r of Soc. Sec.*, No. 20-CV-5369 (MKB), 2023 WL6050096, at *3 (E.D.N.Y. Sept. 15, 2023) (quoting *Butts v. Barnhart*, 388 F.3d 377, 384 (2d Cir. 2004), *as amended*, 416 F.3d 101 (2d Cir. 2005)). "Courts review de novo whether the correct legal principles were applied and whether the

legal conclusions made by the ALJ were based on those principles." *Flores v. Comm'r of Soc. Sec.*, 644 F. Supp. 3d 53, 57 (S.D.N.Y. 2022) (citing *Johnson v. Bowen*, 817 F.2d 983, 986 (2d Cir. 1987)).

When the Appeals Council denies review of an ALJ's decision, the ALJ's decision becomes the final decision of the Commissioner. *Lesterhuis v. Colvin*, 805 F.3d 83, 87 (2d Cir. 2015) (citing *Perez v. Chater*, 77 F.3d 41, 45 (2d Cir. 1996)). In reviewing the Commissioner's decision for substantial evidence, a district court must "review the entire administrative record, which includes the new evidence, and determine, as in every case, whether there is substantial evidence to support the decision of the Secretary." *Lesterhuis*, 805 F.3d at 87 (quoting *Perez*, 77 F.3d at 44).

The "substantial evidence" standard is highly deferential. *Schillo*, 31 F.4th at 74 (citing *Brault v. Soc. Sec. Admin., Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012)). "Substantial evidence" is "more than a mere scintilla"—it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). Yet, the court should not analyze the substance of the medical evidence when doing so would place the courts and not the Commissioner in the position of making factual and medical determinations; hence, the court is limited to reviewing the evidence in light of the Administration's provided reasoning. *Lesterhuis*, 805 F.3d at 88–89 (citations omitted). "If evidence is susceptible to more than one rational interpretation, the Commissioner's conclusion must be upheld." *McIntyre v. Colvin*, 758 F.3d 146, 149 (2d Cir. 2014). On the other hand, if the court is "unable to fathom the ALJ's rationale in relation to evidence in the record," it will not "hesitate to remand for further findings or a clearer explanation for

the decision." *Chichoki v. Astrue*, 729 F.3d 172, 177 (2d Cir. 2013) (quoting *Berry v. Schweiker*, 675 F.2d 464, 469 (2d Cir. 1982)).

Remand may also be warranted where the directives of the Appeals Council are not adhered to by the ALJ in a subsequent decision. "Failure to comply with an [Appeals Council] remand order 'can form the basis for a remand to the Commissioner.'" *Cirelli v. Comm'r of Soc. Sec.*, No. 119-CV-2709 (ER) (SDA), 2020 WL 3405707, at *9 (S.D.N.Y. May 7, 2020), *adopted by* 2020 WL 3402433 (June 19, 2020) (quoting *Metcalf v. Comm'r of Soc. Sec.*, No. 15-CV-01212 (GTS) (WBC), 2017 WL 782981, at *3 (N.D.N.Y. Jan. 26, 2017), *adopted by* 2017 WL 782903 (N.D.N.Y. Feb. 28, 2017)); *see also Cabibi v. Colvin*, 50 F. Supp. 3d 213, 229 (E.D.N.Y. 2014)). An ALJ "shall take any action that is ordered by the Appeals Council and may take any additional action that is not inconsistent with the Appeals Council remand order." 42 U.S.C. § 405(g).

## **DISCUSSION**

On appeal, Plaintiff argues for a reversal of the ALJ's decision or remand for three reasons. First, the ALJ violated the treating physician rule by giving less weight to Dr. Kandalaft and little weight to Dr. Gutwein. (Pl.'s Mot. at 10, 14–19). Second, the RFC finding failed to consider Plaintiff's fibromyalgia diagnosis. (Pl.'s Mot. at 8–12, 20–25). Third, the ALJ improperly concluded that Plaintiff could perform past work by relying on stale vocational witness testimony that conflicted with other evidence. (Pl.'s Mot. at 11, 23–24). Defendant disagrees with each of these points, arguing (1) the ALJ's RFC finding was supported by substantial evidence and properly considered Plaintiff's fibromyalgia diagnosis and the medical opinion evidence, and (2) the ALJ properly relied on previous vocational expert testimony in finding that Plaintiff could perform past work. (Def.'s Mot.).

For the reasons herein, the Court finds the ALJ's decision failed to comply with the Appeals Council's remand order and is not supported by substantial evidence. As such, remand is warranted.

I.    The ALJ Failed to Comply with the Appeals Council's Remand Order

The Appeals Council ordered the ALJ to address several issues on remand. "Despite these directives from the Appeals Council . . . [the ALJ] reached a decision that was virtually indistinguishable" from the prior decision on two specific issues. *Cabibi*, 50 F. Supp. 3d at 230 (remanding for failure to comply with the Appeals Council's order). Comparing the Decisions, minimal information was added in reference to Plaintiff's fibromyalgia diagnosis and the vocational expert testimony. (*See supra* Part I.E). These small additions fall short of addressing the Appeals Council's concerns.

A.    The ALJ's RFC Determination Failed to Properly
       Consider Plaintiff's Fibromyalgia Diagnosis

The Appeals Council specifically directed the ALJ to: (1) give further consideration to (a) the "severity and effects of the claimant's fibromyalgia," (b) "the treating and nontreating source opinions," and (c) "explain the weight given to such opinion evidence," (2) "[e]nsure that the decision adjudicates the correct period at issue," and (3) "give further consideration to [(a)] the claimant's maximum [RFC] in light of the reconsidered evidence," (b) "provide appropriate rationale with specific references to evidence of record," and (c) "identify and resolve any conflicts between the occupational evidence provided by the vocational expert and information in the [DOT.]" (Tr. at 2096–98). The ALJ's slight changes to the 2018 Decision successfully cleared up the "historical" purpose of addressing records from treatment prior to 2012. (*See, e.g.*, Tr. at 1902, 1905). But the 2020 Decision did little, if anything, to heed the Appeals Council's directive to consider

Plaintiff's fibromyalgia diagnosis. (*Compare* Tr. at 12–18 *with* Tr. at 1901–06). The mere *use* of the words "fibromyalgia" and "tender points" does not amount *consideration* of the meaning behind them. (*See* Tr. at 1906); *see Scott v. Barnhart*, 592 F. Supp. 2d 360, 371–72 (W.D.N.Y. 2009) (in addition to failure to follow the Appeals Council's instructions, the second "determination suffers from the same inadequacies as [the ALJ's] earlier determination.") The ALJ discarded the limitations fibromyalgia placed on Plaintiff as inconsistent with the "admitted activities of daily living," but several of the ALJ's conclusions about Plaintiff's daily activities were unfounded by the evidence in the record or hearing transcripts. (Tr. at 24, 1906).

The ALJ further failed to explain why Plaintiff's other testimony, including complaints of lethargy, pain, and lack of activity, consistent with Dr. Gutwein's opinion and Plaintiff's fibromyalgia diagnosis, might not be credible. (Tr. at 24, 1906). "To the extent that a claimant's allegations of pain are not substantiated by the objective medical evidence, the ALJ must engage in a credibility inquiry." *Sanchez v. Colvin*, No. 13-CV-929 (MKB), 2014 WL 4065091, at *14 (E.D.N.Y. Aug. 14, 2014) (first citing 20 C.F.R. § 404.1529(c)(3)(i)-(vii)); and then citing *Meadors v. Astrue*, 370 F. App'x 179, 183 n.1 (2d Cir. 2010)). That credibility inquiry is a seven-factor analysis, including assessment of aggravating factors, measures employed to relieve pain, and factors concerning the claimant's functional limitations and restrictions due to the pain. *Id.* Here, the ALJ did not balance these factors in any way in relation to assessing Plaintiff's complaints of pain, which are abundantly recorded. (*See, e.g.*, Tr. at 59, 181, 274). Instead, the ALJ relied solely on the assumed daily activities of Plaintiff, many of which were no longer applicable or never supported by the record. For example, the ALJ found Plaintiff spent time with her

mother and was social, despite her testimony to the contrary. (Compare Tr. at 26 ("she helped care for her elderly mother . . . socialized with others (on the phone and computer), and had no trouble getting along with others."), with Tr. at 49 ("Everybody that was calling me died."), and 51 ("My mom was - - she died during a simple procedure.")). The ALJ also made erroneous findings about Plaintiff's physical activity. (Compare Tr. at 15, 20, 24 (references to Plaintiff using a treadmill without issues), with Tr. at 62 ("I bought a treadmill but I'm not getting far with it because of how my feet hurt.")) The ALJ also placed an emphasis on Plaintiff's ability to do errands or tasks. (Compare Tr. at 26 (the ALJ noted Plaintiff "prepared simple meals, did small loads of laundry, used public transportation, shopped in stores, handled finances, watched television . . . showered/bathed on a daily basis."), with Tr. at 47 ("I get disgusted and I lose my appetite," "I can't vacuum, because first my back. I wash dishes and clean sometimes."), 50–51 ("I live next door to a shopping center . . . about maybe a five minute walk."))

Even if the activities the ALJ harped on were documented in the record, the Second Circuit has made clear that "[w]hen a disabled person gamely chooses to endure pain in order to pursue important goals," such as meeting with family or friends, "it would be a shame to hold this endurance against him in determining benefits unless his conduct truly showed that he is capable of working." *Balsamo v. Chater*, 142 F.3d 75, 81–82 (2d Cir. 1998) (quoting *Nelson v. Bowen*, 882 F.2d 45, 49 (2d Cir. 1989); *see also Cabibi*, 50 F. Supp. 3d at 238 (finding the ALJ "selectively cited from the record in discrediting [a plaintiff's] complaints" and mischaracterized the activities of "preparing simple meals, doing laundry, washing dishes, cleaning and shopping" as in conflict with fibromyalgia symptoms.) Here, as was the case in *Cabibi*, Plaintiff's testimony included references to

difficulty making meals and carrying laundry because of her pain and fatigue symptoms. (*See, e.g.*, Tr. at 47, 62).

Even more, the fact that medical professionals relied on Plaintiff's subjective complaints to assess the severity of Plaintiff's fibromyalgia symptoms is further evidence that her complaints should not have been dismissed. (Tr. 1544–45); *see Sylvester v. Comm'r of Soc. Sec.*, 692 F. Supp. 3d 46, 53 (E.D.N.Y. 2023) (citing *Rucker v. Kijakazi*, 48 F.4th 86, 92 (2d Cir. 2022)) ("[T]he Second Circuit has found error when an ALJ devalues a treating physician's opinion based on its consideration of subjective patient reports.") This Circuit and others have agreed that "[fibromyalgia's] cause or causes are unknown, there is no cure, and, of greatest importance to disability law, its symptoms are entirely subjective." *Cabibi*, 50 F. Supp. 3d at 233 (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir.1996)); *see also Green–Younger v. Barnhart*, 335 F.3d 99, 108 (2d Cir. 2003) (holding that a growing number of courts "have recognized that fibromyalgia is a disabling impairment and that 'there are no objective tests which can conclusively confirm the disease.'")

Finally, Dr. Gutwein was also a treating physician. (*See* ECF No. 24 at 7). The "treating physician rule . . . mandates that the medical opinion of a claimant's treating physician [be] given controlling weight if it is well supported by medical findings and not inconsistent with other substantial record evidence." *Miracolo v. Berryhill*, 286 F. Supp. 3d 476, 497 (E.D.N.Y. 2018) (citations omitted); *see also Richards v. Comm'r of Soc. Sec.*, No. 23-486, 2024 WL 1673279, at *2 (2d Cir. Apr. 18, 2024) (this rule also applies to the treating physician's opinion of "the nature and severity of the impairment.") (first citing *Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008), then citing 20 C.F.R. §

404.1527(c)(2)). In assigning Dr. Gutwein's opinion "little" weight, the ALJ should have given "good reasons" for doing so. *Sylvester*, 692 F. Supp. 3d at 51 (quoting *Estrella v. Berryhill*, 925 F.3d 90, 96 (2d Cir. 2019)).[7] "Failure to provide such good reasons for not crediting the opinion of a claimant's treating physician is a ground for remand." *Burgess*, 537 F.3d at 129–30. Even assuming Plaintiff engaged in the activities that the ALJ relied on, citing to some evidence that the ALJ considered to be inconsistent with Dr. Gutwein's opinion of Plaintiff's fibromyalgia impairments was not enough to disregard it. *See Green–Younger v. Barnhart*, 335 F.3d 99, 106–07 (2d Cir. 2003) (holding that the ALJ erred in not giving a treating physician's diagnosis of fibromyalgia controlling weight); *see also* 20 C.F.R. § 404.1527(c)(2) (treating physicians offer a "unique perspective to the medical evidence" that cannot otherwise be obtained from the record); *Cabibi*, 50 F. Supp. 3d at 234 ("[A]n inconsistency with a consultative examiner is not sufficient, on its own, to reject the opinion of the treating physician.") (quoting *Moore v. Astrue*, No. 07-CV-5207 (NGG), 2009 WL 2581718, at *10, n. 22 (E.D.N.Y. Aug. 21, 2009)).

Before disregarding a treating physician's opinion, the law requires the ALJ to consider additional factors, such as "the extent and nature of the treatment, the amount of medical evidence supporting the opinion, and whether the physician is a specialist." *Sylvester*, 692 F. Supp. 3d at 53 (citing *Greek v. Colvin*, 802 F.3d 370, 375 (2d Cir. 2015)). "Although such omissions are frequently excused when the ALJ applie[s] the substance of the treating physician rule and provides good reasons for the weight accorded to the

---

[7] Plaintiff filed the claim at issue on August 24, 2015, so it is therefore subject to the treating physician rule as promulgated in 20 C.F.R. § 404.1527(c)(2), and not subject to the new regulations concerning medical opinions for claims filed after March 27, 2017. *See* C.F.R. § 404.1520c(a).

opinion . . . the ALJ did not do so here." *Id.* There is an "importance of relying on the opinion of a medical provider," such as Dr. Gutwein, "since a treating source would have the longitudinal picture of a claimant's impairments, especially given the fact that fibromyalgia often involves varying signs and symptoms." *Cabibi*, 50 F. Supp. 3d at 235 (citing SSR 12–2p, 2012 WL 3104869 (July 25, 2012)). Had the ALJ weighed these considerations, they would point to giving more weight to Plaintiff's treating physician opinions. Instead, the ALJ dismissed Dr. Gutwein's opinion as "not consistent" the with same "activities of daily living" the ALJ relied on throughout. (Tr. at 1906); s*ee Morgan v. Colvin*, 592 F. App'x 49, 50 (2d Cir. 2015) ("[T]he ALJ's conclusory, one-sentence explanation for his decision to reject [a treating physician]'s opinion did not fulfill his obligation to provide good reasons for the weight given to that opinion.") (citing *Halloran*, 362 F.3d at 32).

Accordingly, the ALJ failed to assign the appropriate weight to Plaintiff's fibromyalgia, in direct conflict with the Appeals Council's directive. The ALJ also failed to consider Plaintiff's testimony, failed consider evidence from treating physician Dr. Gutwein, and failed to apply the necessary legal standards before disregarding either.

B.     The ALJ Relied on Stale Vocational Expert Testimony in Error

The Appeals Council also directed the ALJ to resolve the apparent inconsistency between the Plaintiff's needed adjustments and DOT's description of Plaintiff's prior work. The "vocational expert testified that the jobs in question do not involve overhead reaching," but neither the ALJ nor the expert explained why that was not in conflict with the listings. (Tr. at 2097, 68). When asked by Plaintiff's counsel, the expert claimed to know that the jobs she listed did not involve overhead reaching because when she

observed some examples of those kinds of job in the field anecdotally, those positions did not involve overhead reaching. (Tr. at 70–72). Further, the vocational expert did not reconcile the claim that those positions required a "light" exertional level and the fact that Plaintiff "performed her prior work as a document specialist at the medium" exertional level. (Tr. 67–69).

Whether a reaching limitation affects a claimant's ability to work "is not a mere technical or formalistic point." *Selian*, 708 F.3d at 422 (first citing *Zabala v. Astrue*, 595 F.3d 402, 411 (2d Cir. 2010), then citing *Saiz v. Barnhart*, 392 F.3d 397, 400 (10th Cir. 2004)). "Reaching is 'required in almost all jobs,' and a reaching limitation 'may eliminate a large number of occupations a person could otherwise do.'" *Id.* (quoting SSR 85–15, 1985 WL 56857, at *7 (Jan. 1, 1985)). Without justification of how the RFC was determined, the use of the appropriate hypotheticals, or further explanation of why, at least, Plaintiff's reach limitations were not barring of these occupations, the ALJ's determination that Plaintiff could have performed jobs available in the national economy is not supported by substantial evidence. *See Scott v. Barnhart*, 592 F. Supp. 2d 360, 372 (W.D.N.Y. 2009). The ALJ failed to resolve these inconsistencies, contrary to the Appeals Council's order, therefore, remand is necessary.

II.     The Denial Was Not Supported by Substantial Evidence

In addition to the failure to consider the issues presented by the Appeals Council, both Decisions included several inaccuracies. The reliance on these inaccuracies made the Decisions not supported by substantial evidence. *See Genier v. Astrue*, 606 F.3d 46, 50 (2d Cir. 2010) (remand warranted where ALJ's decision "was based on so serious a misunderstanding of [the claimant]'s statements that it cannot be deemed to have

complied with the requirement that they be taken into account.") (citing 20 C.F.R. § 404.1529, 404.1545(a)(3)); *see also Hilsdorf v. Comm'r of Soc. Sec.*, 724 F. Supp. 2d 330, 351 (E.D.N.Y. 2010) (remand warranted where ALJ "wholly ignored the qualifications that Plaintiff placed on his ability to engage in these activities."); *Bradley v. Colvin*, 110 F. Supp. 3d 429, 446 (E.D.N.Y. 2015). The ALJ made repeated references to Plaintiff's other "daily activities" that simply do not appear elsewhere in the record. For example, the ALJ found that Plaintiff regularly took care of her mother. To the contrary, Plaintiff's mother would drive Plaintiff to appointments before she passed away. (Compare Tr. at 26, with Tr. at 43–44, 49, 51). The ALJ claimed Plaintiff socialized. To the contrary, Plaintiff testified to having no one to speak with, and her records indicate consistent complaints of social withdrawal and isolation. (*See, e.g.*, Tr. at 49, 485, 1628). The ALJ also repeatedly referred to Plaintiff's "regular" exercise on a treadmill. In contrast, Plaintiff qualified her use of the treadmill with the pain in her feet and legs. (*See* Tr. at 15, 20, 24, 62).

The Decisions also emphasized Plaintiff's ability to care for pets, and specifically claimed that she had a cat, but there is no citation in the record supporting this finding. (Tr. at 16, 19, 1907). There is no mention of Plaintiff having a pet in transcripts of the hearings or the medical records. Plaintiff did refer to playing a game called *Pet Rescue*, but that is surely not the same as caring for a living, breathing, pet cat. (Tr. at 48).

Further, the ALJ claimed Plaintiff's anxiety was improved with Xanax, but there is nothing in the record to support this finding of improvement. (Exs. B9F, B40F). The exhibits cited only point out Plaintiff's symptoms of anxiety and the fact that she was prescribed Lorazepam. (Tr. 22; Exs. B9F, B40F). The ALJ also found Plaintiff was

prescribed Klonopin that alleviated her symptoms, but this too, is an exaggeration. (Tr. at 23, 1905 (citing to Ex. B2F)). The medical records the ALJ relied on for this point include ample documentation of symptoms consistent with Plaintiff's testimony (*see, e.g.*, Tr. 288, 295, 307), yet the ALJ took the statements that she "appears to be very anxious," "had anxiety attacks in the past few months," and "was placed on Klonopin with some effect" to mean that Plaintiff's symptoms were remedied entirely. (Tr. at 310).

At times, the Decisions read as though the ALJ may have been referring to an entirely different person; they paint a storybook existence that simply does not match Plaintiff's medical records or accounts shared at the hearings. Indeed, Plaintiff provided ample evidence of the difficulties she faced. The record itself spans over 2700 pages. The records within, as noted above, provide consistent documentation for Plaintiff's back pain, left leg and foot pain, fatigue, difficulty focusing, difficulty sitting and standing, depression, and anxiety.

In addition to failing to comply with the Appeals Council's order, the ALJ's decision is not supported by substantial evidence. Thus, another remand is necessary.

III.    <u>Nature of Remand</u>

The Second Circuit has previously allowed remand solely for the calculation of benefits in situations where "no purpose would be served by our remanding the case for rehearing" and rehearing "could well delay the payment of benefits to which the claimant appears to be entitled for still further years." *Balsamo v. Chater*, 142 F.3d 75, 82 (2d Cir. 1998) (remanding to the district court "with directions to remand the case to the Commissioner for the calculation of benefits, subject to the district court's disposition . . . of any motion by the Commissioner for a remand to the ALJ for the consideration of

additional evidence.") Remand for the calculation of benefits is typically inappropriate, however, "[u]pon a finding that an administrative record is incomplete or that an ALJ has applied an improper legal standard." *See Cabibi*, 50 F. Supp. 3d at 241 (citing *Curry v. Apfel*, 209 F.3d 117, 124 (2d Cir. 2000)). Here, the only additional evidence the ALJ may require is further clarification from a vocational expert, but the failure to apply the proper standards to the consideration of Plaintiff's fibromyalgia diagnosis and Dr. Gutwein's opinions also makes remanding for the calculation of benefits inappropriate. *Id.* The Court is sympathetic to the many years Plaintiff's estate has waited for a resolution of this matter, compounded by the need for remand. But "absent a finding that the claimant was actually disabled, delay alone is an insufficient basis on which to remand for benefits." *Henry v. Colvin*, 561 F. App'x 55, 58 (2d Cir. 2014) (quoting *Bush v. Shalala*, 94 F.3d 40, 46 (2d Cir.1996)). "A remand for calculation of benefits is appropriate only when application of the correct legal standard 'could lead to but one conclusion.'" *Cabibi*, 50 F. Supp. 3d at 242 (quoting *Maldonado v. Comm'r of Soc. Sec.*, No. 12-CV-5297 (JO), 2014 WL 537564, at *18 (E.D.N.Y. Feb. 10, 2014)). When applying the correct standard and crediting the treating physicians and Plaintiff's testimony, the ALJ may very well find, and indeed should find, that Plaintiff is disabled, but that is unfortunately not a decision that this Court may now make on its own.

Thus, this case is remanded with instructions for the ALJ that mirror those given by the Appeals Council. On the grounds that the ALJ failed to heed the directives of the Appeals Council and the 2020 Decision was not supported by substantial evidence, the Court finds that remand is warranted so that an ALJ can issue a new decision based on

substantial evidence and proper legal standards. *See Cabibi v. Colvin*, 50 F. Supp. 3d 213; *Green-Younger*, 335 F.3d at 108; *Sarchet*, 78 F. 3d at 309.

## **CONCLUSION**

For the reasons set forth above, the Court grants Plaintiff's motion for judgement on the pleadings and denies Defendant's motion. This case is remanded for further proceedings consistent with this Memorandum and Order. The Clerk of the Court is respectfully directed to close the case.

SO ORDERED.

Hon. Ramón E. Reyes, Jr.   Digitally signed by Hon. Ramón E. Reyes, Jr.
Date: 2024.09.05 18:04:16 -04'00'

_____

RAMÓN E. REYES, JR.
United States District Judge

Dated: September 5, 2024
Brooklyn, NY